1

2

3

4                              IN THE UNITED STATES DISTRICT COURT

5                            FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7    KENNETH KELLERMAN,                          No. C 11-4727 PJH

8                   Plaintiff,                   **ORDER RE PLAINTIFF'S MOTION FOR**
                                                 **SUMMARY JUDGMENT AND**
9         v.                                     **DEFENDANT'S CROSS-MOTION FOR**
                                                 **SUMMARY JUDGMENT**
10   MICHAEL J. ASTRUE, Commissioner of
     Social Security,
11
                   Defendant.
12   _____/

13

14        Plaintiff Kenneth Kellerman ("Kellerman") seeks judicial review of the Commissioner

15   of Social Security's ("the Commissioner") decision denying his claim for disability benefits.

16   This action is before the court on the parties' cross-motions for summary judgment.  Having

17   read the parties' papers and administrative record, and having carefully considered their

18   arguments and relevant legal authority, the court DENIES Kellerman's motion for summary

19   judgment, GRANTS the Commissioner's cross-motion for summary judgment, and

20   AFFIRMS the decision of the administrative law judge.

21                                      **BACKGROUND**

22   **A.    Procedural Background**

23        Kellerman filed an application for social security disability insurance ("SSDI")

24   benefits on March 2, 2009, and an application for supplemental security income ("SSI")

25   benefits on March 27, 2009.  Kellerman alleged he suffered from bipolar disorder,

26   depression, anxiety, scoliosis, heart pain, and back pain.  As a result of these conditions,

27   specifically his depression and back pain, Kellerman claimed he had been unable to work

28   since August 17, 2008.  The Commissioner denied Kellerman's applications initially on

**United States District Court**
For the Northern District of California

1   June 4, 2009, and again, upon reconsideration, on December 21, 2009.

2       Kellerman filed a request for a hearing on January 1, 2010.  On May 20, 2010, a

3   hearing was conducted before an administrative law judge ("ALJ").  Kellerman appeared

4   and testified at the hearing.  He was represented by David J. Linden, an attorney.  In a

5   subsequent decision dated July 30, 2010, the ALJ found that Kellerman was not disabled

6   within the meaning of the Social Security Act ("the Act").

7       On August 8, 2010, Kellerman requested that the Appeals Council review the

8   unfavorable ALJ decision.  The Appeals Council denied the request for review, making the

9   ALJ's decision the final decision of the Commissioner.  On September 22, 2011, Kellerman

10  brought this action seeking judicial review of the ALJ's decision pursuant to 42 U.S.C.

11  § 405(g).

12  **B.    Factual Background**

13      At the hearing, Kellerman reported feeling depressed for "all of [his] life"  A.T. 66.

14  The administrative record includes medical reports and opinions dating back to 1998.

15      On April 11, 2005, Leonti Thompson, M.D., completed a psychological evaluation of

16  Kellerman.  Kellerman reported using alcohol, hallucinogens, amphetamines, and opiates

17  in the past, but stated that "[s]ince the beginning of this year he ha[d] been sober - currently

18  . . . drink[ing] once or twice a month over the past 4 months."  A.T. 263.  Dr. Thompson

19  diagnosed Kellerman with an Axis I Mood Disorder, Polysubstance Dependence, and

20  Specific Phobia (heights).

21      On May 17, 2005, Kellerman briefly visited the Queen of the Valley Hospital ("the

22  Hospital) in Napa, California, prior to being sent to jail.  He reported drinking excessive

23  amounts of hard alcohol, and stated that although he was involved in an outpatient

24  alcoholic rehabilitation program, he had not been compliant with his program.  Kellerman

25  also stated he may have missed doses of his prescribed medications.  This was one of

26  several of Kellerman's visits to the Hospital.

27      Previously, on December 30, 2003, Kellerman visited the Hospital after he was

28  found intoxicated on the pavement with a fractured nose.  On May 30, 2004, police found

*United States District Court*
*For the Northern District of California*

Kellerman "severely intoxicated" sitting next to his bike with a bruise on his forehead.  A.T. 302.  Doctor notes state that Kellerman was "not a very good historian and his information [wa]s unreliable."  Id.  On June 1, 2004, police brought Kellerman to the Hospital for medical clearance upon finding him intoxicated in public.  Again, on May 16, 2005, police brought Kellerman to the Hospital after initially taking him to jail.

On November 8, 2005, Janet Cain, Ph.D., performed a psychological evaluation of Kellerman, and diagnosed him with major depression, recurrent moderate, and alcohol dependence.

There are no medical records from 2006, 2007 or 2008.

On February 25, 2009, Kellerman visited the Community Health Clinic Ole in Napa, California, requesting a refill of medication and complaining of back pain.  The physician's assistant recommended physical therapy.  Kellerman returned a month later.  Kellerman was told to "Avoid Alcohol!!;" however, Kellerman declined the doctor's recommendation for a substance abuse program.  A.T. 349.

On March 9, 2009, a Queen of the Valley Hospital medical report stated Kellerman had "[a] moderately severe S-shaped thoracolumbar spinal curvature."  A.T. 445.

On May 4, 2009, after Kellerman had applied for disability benefits, Dr. Renfro, an examining physician, performed a psychiatric evaluation of Kellerman, noting that "[t]his evaluation is not to be and must not be construed to be a complete psychological evaluation for mental health purposes."  A.T. 350.  Kellerman stated that "he ha[d] stopped drinking within the past two years."  A.T. 353.  Kellerman also told Dr. Renfro that he lost his job as a home health caregiver in August 2008, because "[his] abilities weren't up to it."  A.T. 352.  Kellerman denied a history of arrests and incarceration.  Id.  Dr. Renfro recommended mental health treatment, and noted that "[a] medical examination is recommended to assess limitations as they may relate to his reported medical history and current ability to work."  A.T. 354.  Dr. Renfro, nevertheless, found that Kellerman would be able to understand, remember, and carry out simple one-to-two step job instructions; would be unable to handle detailed or complex instructions; would be impaired in abilities to relate

United States District Court
For the Northern District of California

3

1    and interact with others; would be impaired in persistence and pace; would be impaired in

2    accepting instructions from supervisors; and would be impaired in working on a consistent

3    basis.  A.T. 355.

4         On May 9, 2009, Dr. Navjeet Boparai completed an orthopedic evaluation of

5    Kellerman.  Dr. Boparai noted that Kellerman was able to walk, sit comfortably, and remove

6    his shoes and socks and put them back on without difficulty.  Kellerman reported that he

7    was able to perform housework, and that he spent his days riding his bike, watching TV

8    and reading.  Dr. Boparai opined Kellerman could stand and/or walk for four hours per day;

9    sit for four hours per day; lift and carry up to twenty pounds occasionally and up to ten

10   pounds frequently, and frequently climb, balance, stoop, knell, crouch and crawl.  A.T. 359.

11        On May 22, 2009, state agency psychologist Dr. Klein, reviewed Kellerman's record

12   and opined that he had mild restrictions in his activities of daily living, moderate limitations

13   in maintaining social functioning, and moderate limitations in maintaining concentration,

14   persistence, or pace.  Dr. Klein stated that he did not adopt some of Dr. Renfro's findings

15   because Dr. Renfro was overly reliant on Kellerman's subjective complaints which were

16   inconsistent with the record.  Dr. Klein stated that other evidence, including Dr. Boparai's

17   report and Dr. Renfro's objective findings, showed greater functioning than Dr. Renfro

18   opined.  Dr. Klein's functional capacity assessment stated Kellerman could perform one to

19   two-step tasks; could perform detailed tasks; could maintain adequate social interaction

20   with supervisors, and should have minimal social interaction with coworkers and the public.

21   A.T. 375.

22        In July 2009, Kellerman sought treatment with Solano County Health and Social

23   Services.  On July 22, 2009, Kellerman told a social worker that he had a history of binge

24   drinking, and that in August 2008, he had received a DUI.  As a result of his DUI, Kellerman

25   stated that he was imprisoned for two months and lost his job.  On September 25, 2009,

26   Kellerman's depression was reported as being "controlled," and Kellerman stated that his

27   mood was improving because he had a new job opportunity.  A.T. 418.

28        In December 2009, Kellerman returned to Community Health Clinic Ole where he

**United States District Court**
For the Northern District of California

4

United States District Court
For the Northern District of California

1  was treated primarily by Dr. Wilson.  On December 15, 2009, Clinic Ole notes show

2  Kellerman was mildly depressed.  Clinic notes from February 1, 2010, March 15, 2010,

3  April 26, 2010, and May 10, 2010 all report Kellerman's mood within normal range and/or

4  pleasant.  In February 2010, Kellerman stated that he had been sober for six years.

5  However, the following month, Kellerman stated that he was drinking two beers per week,

6  but avoiding social situations that triggered his marijuana use.  Clinic notes from March 26,

7  2010 show that Kellerman's depression symptoms had increased.   As a result, Kellerman

8  was interpreted as having moderately severe depression.  Kellerman began new treatment,

9  and subsequent clinic notes show Kellerman's symptoms improved and his mood was

10  again reported as pleasant.

11        On May 25, 2010, Dr. Wilson completed a "check-the-box style" form concerning the

12  nature and severity of Kellerman's mental impairments.  Dr. Wilson opined that Kellerman

13  was moderately limited in thirteen out of twenty categories of work functioning.  Dr. Wilson

14  did not explain or support her responses with any information or medical findings.

15                                    **LEGAL STANDARD**

16        For purposes of the Act, a claimant is disabled if he is "[unable] to engage in any

17  substantial gainful activity by reason of any medically determinable physical or mental

18  impairment which can be expected to result in death or which has lasted or can be

19  expected to last for a continuous period of not less than twelve months."  42 U.S.C.

20  § 423(d)(1)(A).  To evaluate whether a claimant is disabled within the meaning of the Act,

21  the ALJ is required to use a five-step analysis.  See 20 C.F.R. § 416.1520(a)(4); see also

22  Pitzer v. Sullivan, 908 F.2d 502, 504 (9th Cir. 1990).  The ALJ may terminate the analysis

23  at any stage where a decision can be made that the claimant is or is not disabled.  Pitzer,

24  908 F.2d at 504.

25        At step one, the ALJ determines whether the claimant is engaged in any "substantial

26  gainful activity," which would automatically preclude the claimant from receiving benefits.

27  See 20 C.F.R. § 404.1520(a)(4)(I).  At the second step, the ALJ must determine whether

28  the claimant has a "severe" impairment or combination of impairments which significantly

**United States District Court**
For the Northern District of California

1   limits his ability to do basic work activities.  See 20 C.F.R. § 404.1520(a)(4)(ii).

2      At the third step, the ALJ must determine whether the claimant's impairment or

3   combination of impairments meets or equals an impairment in the Listing of Impairments

4   ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1.  See 20 C.F.R.

5   § 404.1520(a)(4)(iii).  If the claimant's impairment or combination of impairments meets or

6   equals an impairment in the Listing, the claimant is presumed to be disabled and benefits

7   are awarded.  See id.  Alternatively, if disability cannot be established at the third step, the

8   analysis proceeds.  See id.

9      The fourth step requires the ALJ to determine whether the claimant has sufficient

10  residual functional capacity ("RFC") to perform his past relevant work.  See 20 C.F.R. §

11  404.1520(a)(4)(iv).  The burden lies with the claimant to prove his inability to perform past

12  relevant work.  See Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  If the claimant

13  cannot perform his past work, the ALJ is required to show, at step five, that the claimant

14  can perform other work that exists in significant numbers in the national economy, taking

15  into consideration the claimant's "residual functional capacity, age, education, and past

16  work experience."  See id.; see also 20 C.F.R. § 404.1520(a)(4)(v).

17                              **ALJ's FINDINGS**

18     The ALJ ultimately concluded that Kellerman was not disabled at step five of the Act.

19  Beginning at step one, the ALJ found that Kellerman had not engaged in any substantial

20  gainful activity since August 17, 2008, his alleged onset date.  At the second step, the ALJ

21  determined Kellerman had the following severe impairments: depression and moderately

22  severe scoliosis.  The ALJ also found that Kellerman suffered from hepatitis C and a history

23  of alcohol dependence, but that they did not qualify severe.

24     Following these step two findings, the ALJ summarized a substantial portion of the

25  medical evidence from the record.  The ALJ noted reports and opinions from Dr. Leonti

26  Thompson (2005), Dr. Janet Cain (2005), Dr. T. Renfro (2009), Dr. Navjeet Boparai (2009),

27  Dr. Francis Kuan-Jen Ko (2009), and Dr. Jennifer Wilson (2009-2010).

28     At the third step, the ALJ determined that Kellerman did not have an impairment or

United States District Court
For the Northern District of California

1  combination of impairments that met or medically equaled a Listed impairment in 20 C.F.R.,

2  Part 404, Subpart P, Appendix 1.  In evaluating the severity of Kellerman's impairments,

3  the ALJ considered whether Kellerman satisfied the "paragraph B criteria."[1]   The ALJ

4  found that Kellerman suffered from some mild and moderate difficulties; however, the ALJ

5  found no "marked" limitations and no "repeated" episodes of decompensation.  Accordingly,

6  the ALJ found that Kellerman did not suffer from a Listed impairment.

7      The ALJ then assessed Kellerman's RFC to consider whether it was sufficient for

8  him to perform his past work as a home health caregiver, taxi driver, sales associate, movie

9  theater assistant manager, and waiter.  The ALJ found that Kellerman "has the []RFC to

10  perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except as follows:

11  lift or carry 20 pounds occasionally and 10 pounds frequently; sit for 4 hours in an 8 hour

12  workday; stand or walk for 4 hours in an 8 hour workday . . .; with an option to sit/stand at

13  30 minute intervals; can understand, remember and carry out one or two step tasks; with

14  occasional interaction with coworkers and the general public; in a low stress work

15  environment defined as a setting where there is little to no change in the work routine day

16  to day; and no fast-paced production rate work."  A.T. 21-22.

17      When determining Kellerman's RFC, the ALJ considered Kellerman's symptoms in

18  conjunction with the objective medical evidence as well as other evidence in the record.  In

19  doing this, the ALJ applied another two-step process, (1) looking at whether there was an

20  underlying medically determinable physical or mental impairment that could reasonably be

21  expected to produce Kellerman's pain or other symptoms; and (2) evaluating the intensity,

22  persistence and limiting effects of Kellerman's symptoms to determine the extent to which

23  they limited his functioning.  Whenever certain pain or symptom statements were not

24

25  [1] In order for a claimant suffering from depression to qualify for disability benefits under
   the Listing, the subsection B requirements ("paragraph B criteria") under 20 C.F.R., Part 404,
26  Subpart P, Appendix 1 § 12:04 must be met.  Paragraph B criteria under § 12.04 indicates the
   severity of the illness.  To satisfy the "paragraph B criteria" a claimant's mental impairments
27  must result in at least two of the following: marked restriction of activities of daily living; marked
   difficulties in maintaining social functioning, marked difficulties in maintaining concentration,
28  persistence, or pace; or repeated episodes of decompensation, each of extended duration.

United States District Court
For the Northern District of California

substantiated by objective medical evidence, the ALJ made findings as to the credibility of such statements.

The ALJ found some of Kellerman's symptom statements to be unreliable and found that Kellerman lacked credibility.  In fact, the ALJ concluded that Kellerman's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, that [Kellerman's] statements concerning intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  A.T. 24.

In support of his adverse credibility conclusion, the ALJ discussed several issues.  The ALJ noted Kellerman's conservative treatment for his back and depression.  A.T. 24.  The ALJ also addressed Kellerman's testimony that his depression and anxiety were the main reasons he had trouble keeping jobs in the past.  Id.  The ALJ found this testimony inconsistent since Kellerman claimed to suffer from depression for as long as he could remember, yet his work history showed that he was able to work for nearly three years at a movie theater, and for approximately twenty years as a waiter despite suffering from depression and anxiety.  Id.  Additionally, Kellerman's work history included some shorter term work, including working as a taxi driver and home health caregiver.  Id.  The ALJ noted that Kellerman's shorter term work was in "arguably very stressful jobs and [the ALJ] afforded limitations in this regard that may account for [Kellerman's] reported trouble interacting with others and dealing with stress."  Id.  Additionally, the ALJ explained that Kellerman had attempted volunteer work and that his activities did not appear to be severely limited.  Id.

In further assessing Kellerman's credibility, the ALJ explained that he had a significant history of alcohol dependence, and the ALJ noted that Kellerman made multiple inconsistent statements about his continued drinking.  Id.

The ALJ gave little weight to the May 25, 2010 mental RFC report prepared by treating physician, Dr. Jennifer Wilson, because the report was not accompanied by any rationale.  Id.  Moreover, treating notes from the Community Health Clinic Ole, where Dr.

1  Wilson worked, reflected only mild depressive symptoms, which were consistent with other

2  clinic records.  Id.  Also, the ALJ noted that prior to a May 2010 referral for counseling,

3  Kellerman's antidepressant medication regime was stable.  Id.

4          After determining Kellerman's RFC, the ALJ assessed whether Kellerman could

5  perform any past relevant work.  In doing so, the ALJ relied on testimony by vocational

6  expert ("VE"), Stephen P. Davis, who testified at the hearing via telephone.  The VE stated

7  that Kellerman's skill level precluded him from performing his past work as a home health

8  caregiver, taxi driver, movie theater assistant manager, and waiter.

9          Upon determining at step four that Kellerman could not preform his past work, the

10 ALJ then proceeded to step five.  The ALJ determined that, considering Kellerman's age,

11 education, work experience, and residual functional capacity, there were jobs that existed

12 in significant numbers in the national economy that Kellerman could perform.  In support,

13 the ALJ noted that Kellerman was fifty-two years-old on his alleged onset date, was able to

14 communicate in English, and had a least a high school education.

15         The ALJ utilized the VE and inquired whether jobs existed in the national economy

16 for an individual with Kellerman's age, education, work experience and RFC.  The VE

17 responded positively, identifying two jobs: (1) table worker, and (2) electronic goods

18 assembler.  The VE testified that there were 549,000 table worker jobs nationally and

19 33,000 in the San Francisco Bay area.  However, the VE noted those numbers would be

20 eroded by twenty-five percent given Kellerman's need for a sit/stand option.  As for the

21 assembler position, the VE testified there were 300,000 jobs nationally and 35,000 jobs in

22 the San Francisco Bay area.  Again, however, those numbers decreased by twenty-five

23 percent when the sit/stand option was applied.  Relying on the VE's testimony, the ALJ

24 concluded that Kellerman could perform other work that existed in significant numbers in

25 the national economy.  Accordingly, the ALJ found Kellerman "not disabled."  A.T. 26.

26                                    **STANDARD REVIEW**

27         This court has jurisdiction to review a final decision of the Commissioner pursuant to

28 42 U.S.C. § 405(g).  The ALJ's decision must be affirmed if the ALJ's findings are

**United States District Court**
For the Northern District of California

9

United States District Court
For the Northern District of California

"supported by substantial evidence and if the [ALJ] applied the correct legal standards." Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001) (citing Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999)).  Substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009) (quoting Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988)).  The evidence must be "more than a mere scintilla," but may be "less than a preponderance".  Id. (quoting Desrosiers, 846 F.2d at 576) (internal quotation marks and citations omitted)).

If the evidence is susceptible to more than one rational interpretation, the court must uphold the ALJ's findings if they are "'supported by inferences reasonably drawn from the record.'" Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004)).  Also, the court may not reverse an ALJ's decision on account of an error that is harmless.  Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing Stout v. Comm'r Soc. Sec. Admin., 454 F.3d 1050, 1055-56 (9th Cir. 2006)).  "'[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.'" Id. (quoting Shinseki v. Sanders, 556 U.S. 396, 409 (2009)).

### ISSUES

Kellerman seeks reversal of the ALJ's decision, arguing that the ALJ:

(1)    improperly rejected Kellerman's credibility;

(2)    erred in rejecting third-party testimony submitted by Kellerman's friend, Mary Kathryn Tarlecki;

(3)    improperly rejected the opinion of Dr. Wilson;

(4)    erred in failing to discuss the weight afforded to Dr. Renfro's opinion;

(5)    erred in failing to discuss the weight afforded to Dr. Klein's opinion; and

(6)    erred at step five because the VE's testimony was flawed since it was not based on the proper framework, was inconsistent with the Dictionary of Occupational Titles ("DOT"), and did not include all of Kellerman's impairments.

United States District Court
For the Northern District of California

1   **1.    Kellerman's Credibility**

2        Kellerman challenges the ALJ's determination that his testimony regarding the

3   severity of his symptoms lacked credibility.

4        The ALJ concluded that Kellerman's statements concerning the intensity,

5   persistence and limiting effects of his symptoms were not credible.  In support of this

6   conclusion, the ALJ noted: (1) that Kellerman made inconsistent statements about his

7   alcohol consumption; (2) that Kellerman received conservative treatment for his conditions;

8   and (3) that Kellerman's work history and activities were inconsistent with his allegations

9   regarding the severity of his impairments.

10        Kellerman argues the ALJ improperly rejected his statements regarding the intensity,

11   persistence and limiting effects of his symptoms.  He does not address the inconsistencies

12   in his statements regarding his alcohol consumption.  However, he does argue that the ALJ

13   erred in relying on his conservative treatment, work history and activities to support the

14   conclusion that he lacked credibility.

15        If an ALJ finds that a claimant's testimony regarding the severity of his pain and

16   impairments is unreliable, the ALJ must give "'specific, clear and convincing reasons'" for

17   rejecting the claimant's testimony.  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir.

18   2007) (quoting Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); citing Robbins v.

19   Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) ("[U]nless an ALJ makes a finding of

20   malingering based on affirmative evidence thereof, he or she may only find an applicant not

21   credible by making specific findings as to credibility and stating clear and convincing

22   reasons for each.")).  In doing so, an ALJ may rely on inconsistent statements about

23   alcohol use to reject a claimant's testimony.  See Thomas v. Barnhart, 278 F.3d 947, 959

24   (9th Cir. 2002) (citing Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999)).  Evidence of

25   "conservative treatment" may also be used to support an ALJ's adverse credibility finding.

26   Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) (quoting Johnson v. Shalala, 60 F.3d

27   1428, 1434 (9th Cir. 1995).  Furthermore, an ALJ may rely on inconsistencies in the

28   claimant's work history and daily activities when providing specific, clear and legitimate

**United States District Court**
For the Northern District of California

1    reasons for rejecting a claimant's testimony.  Thomas, 278 F.3d at 958-59 (citing Light v.

2    Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997)).  "If the ALJ's credibility finding is

3    supported by substantial evidence in the record, [the court] may not engage in

4    second-guessing."  Id. at 959 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595,

5    600 (9th Cir. 1999)).

6            Here, there is substantial evidence in the record to support the ALJ's finding that

7    Kellerman's inconsistent statements about his alcohol use reflected his overall lack of

8    credibility.  Medical reports as early as 2004 showed that Kellerman was "not a very good

9    historian and his information [wa]s unreliable."  A.T. 302.  On April 11, 2005, Kellerman told

10   Dr. Leonti Thompson that he had been sober from the beginning of 2005.  A.T. 263.  At that

11   same appointment, however, Kellerman stated that "he drinks once or twice a month."  Id.

12   The following month, on May 17, 2005, a medical report from Queen of the Valley Hospital

13   noted that Kellerman's chief complaint was that he had been drinking too much and

14   "[Kellerman] stated that over the last three days he had been drinking up to 1.75 liters of

15   hard alcohol."  A.T. 292.  On November 8, 2005, Kellerman told Dr. Janet Cain that he only

16   occasionally drinks beer.  A.T. 344.  On May 4, 2009, Kellerman saw Dr. Renfro and

17   reported that he had stopped drinking within the past two years.  A.T. 353.  Yet, on

18   February 1, 2010, less than one year later, Clinic Ole notes show that Kellerman reported

19   he had been sober for the past six years.  A.T. 434.  At the hearing, Kellerman stated that

20   he had stopped drinking, but then admitted to drinking earlier that month.  A.T. 57.  It was

21   reasonable for the ALJ to view these inconsistencies as undermining Kellerman's

22   credibility.  See Thomas, 278 F.3d at 959 (upholding an adverse credibility finding because

23   the claimant's inconsistent statements to her doctors about her alcohol and drug use

24   showed a lack of candor that carried over to her pain testimony).

25           In support of his finding that Kellerman's testimony lacked veracity, the ALJ also

26   noted Kellerman's conservative medical treatment.  "[E]vidence of 'conservative treatment'

27   is sufficient to discount a claimant's testimony regarding severity of an impairment."  Parra,

28   481 F.3d at 751 (quoting Johnson, 60 F.3d at 1434).  Here, Kellerman claimed he was

United States District Court
For the Northern District of California

1  disabled because of his back pain and depression.  Medical evidence shows that Kellerman

2  received minimal treatment for his back pain, limited to Naproxen.  A.T. 347, 349, 357.

3  Medical evidence also states that Kellerman's depression was "controlled" using anti-

4  depressants.  A.T. 418.  In 2010, medical reports showed Kellerman's depression was

5  controlled and improving, as his mental status was consistently normal, with normal and

6  pleasant mood, good judgment, and no suicidal ideation.  A.T. 426, 428, 432, 434.

7  Kellerman refused to take a "mood stabilizer because he like[d] the 'hypomania.'"  A.T. 440.

8  Kellerman also declined substance abuse treatment and failed to heed doctors' orders to

9  avoid alcohol.  A.T. 349, 329.  There is substantial evidence to support the ALJ's finding

10  that Kellerman's subjective statements regarding the disabling effects of his back pain and

11  depression were inconsistent with the conservative treatment he received.

12      Additionally, the ALJ discussed inconsistencies between Kellerman's testimony, and

13  his work history and activities.  An ALJ may rely on inconsistencies in a claimant's work

14  record and daily activities when rejecting a claimant's testimony.  See Thomas, 278 F.3d at

15  958-59 (citing Light, 119 F.3d at 792).  Here, medical reports showed that Kellerman

16  suffered from depression as early as 2004, and Kellerman himself reported having

17  depression "all [his] life."  A.T. 66.  Yet, despite suffering from depression, Kellerman was

18  able to sustain long term substantial gainful activity both as a movie theater manager and a

19  waiter.[2]  The ALJ also found that Kellerman's reported activities were inconsistent with the

20  severity of impairments that Kellerman alleged.  The record showed that Kellerman was

21  able to care for himself, wash dishes, vacuum, shop, prepare simple meals, ride a bicycle,

22  walk, read, garden, handle money, and volunteer at a library.  The record supports the

23  ALJ's reasonable inference that Kellerman's symptom statements were undermined by his

24  work history and activities.

25  _____

26      [2] Kellerman argues that the ALJ erred in relying on his past work when determining that
   he was not being forthright about his ability to work during the period of alleged disability, since
27  the ALJ also found, at step four, that Kellerman cannot perform his past work.  While the ALJ's
   inference appears reasonable based on the record, any error was harmless since the ALJ has
28  provided numerous reasons for discounting Kellerman's testimony that are supported by
   substantial evidence.

**United States District Court**
For the Northern District of California

1  Because there is substantial evidence in the record to support the ALJ's finding that

2  Kellerman's statements concerning the intensity, persistence and limiting effects of his

3  symptoms were not credible, the court affirms the ALJ's adverse credibility finding.

4  **2.  Third-Party Testimony**

5  Kellerman also argues that the ALJ erred because he failed to address a

6  handwritten third-party function report that his friend, Mary Kathryn Tarlecki, submitted to

7  the ALJ.

8  Lay testimony regarding a claimant's symptoms or impairments must be taken into

9  consideration by the ALJ, and "'cannot be disregarded without comment.'" Molina, 674

10  F.3d at 1114 (quoting Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996); citing Dodrill

11  v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993)).  However, an ALJ need only provide

12  "'reasons that are germane to each witness,'" and is not required to "discuss every

13  witness'[] testimony on a individualized, witness-by-witness basis." Id. (quoting Dodrill, 12

14  F.3d at 919.)  Accordingly, if an ALJ cites specific reasons for rejecting the testimony of one

15  witness, the ALJ may simply point to those reasons when rejecting similar testimony by a

16  different witness. Id. (citing Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 694 (9th

17  Cir. 2009)).

18  Here, however, the ALJ did not mention Tarlecki's testimony, much less point to any

19  reasons for rejecting it.  The Ninth Circuit addressed this precise issue in great detail in

20  Molina v. Astrue, 674 F.3d 1104, 1114-1122 (9th Cir. 2012).  In Molina, the ALJ failed to

21  discuss the testimony of the claimant's family members.  While the court held the ALJ erred

22  in failing to explain her rejection of the lay testimony, it found the error to be harmless

23  because the ALJ would have reached the same result absent the error. Id. at 1115.

24  In Molina, the claimant, relying primarily on Stout v. Commissioner, Social Security

25  Administration, 454 F.3d 1050 (9th Cir. 2006), argued that "an ALJ's failure to give

26  individualized reasons for rejecting a lay witness'[] testimony that would be material

27  standing alone is per se prejudicial, even if the ALJ gave well-supported reasons for

28  rejecting similar testimony." Molina, 674 F.3d at 1117.  The court disagreed. Id.  Rather,

14

**United States District Court**
For the Northern District of California

1  the court held that "if an ALJ provided well-supported grounds for rejecting testimony

2  regarding specified limitations, [the court] cannot ignore the ALJ's reasoning and reverse

3  the agency merely because the ALJ did not expressly discredit each witness who described

4  the same limitations." Id. at 1121.  Since "[t]he ALJ gave reasons for rejecting [the

5  claimant]'s testimony regarding her symptoms that were equally relevant to the similar

6  testimony of the lay witnesses, and that would support a finding that the lay testimony was

7  similarly not credible," the court held that the ALJ's failure to discuss the lay testimony was

8  a harmless error. Id. at 1115, 1122.

9       Here, Tarlecki's report was similar to Kellerman's own testimony.  Tarlecki reported

10  that Kellerman, from the time he would wake up until the time he went to bed, sometimes

11  didn't get out, but other times, would eat breakfast, run errands, ride his bike around job

12  hunting, watch T.V., read, and sleep.  A.T. 182.  This was similar to Kellerman's own

13  testimony that he "tr[ied] to eat some food for breakfast," "look[ed] into job possibilities,"

14  "walk[ed] or bike[d] around town," and "like[d] to watch TV and read books till [he would]

15  go to bed."  A.T. 174, 181.  Tarlecki also stated that Kellerman "help[ed] around the house

16  if he c[ould]."  A.T. 183.  Kellerman himself reported that he "d[id] chores as needed," and

17  explained he was able to mow, rake, vacuum, sweep, mop, and do laundry.  A.T. 176.

18  Tarlecki reported that Kellerman used to be able to hold a job, but could no longer do so

19  because of his conditions.  A.T. 183.  Tarlecki also noted that Kellerman's conditions made

20  it hard for him to sleep.  A.T. 183.  Again, this was similar to Kellerman's own testimony.

21  See A.T. 175.

22       Just as Kellerman himself reported that personal care tasks frustrated him, A.T. 175,

23  Tarlecki stated that Kellerman was "sometimes [] frustrated with his personal care."  A.T.

24  183.  Tarlecki reported that Kellerman sometimes needed reminders and encouragement;

25  that he prepared simple meals a few times a week, went shopping a few times a week,

26  struggled with concentration, and got along "okay" with authority figures.  A.T. 184-188.

27  Kellerman himself reported the same information.  A.T. 176-180.  The only information

28  provided by Tarlecki that was not provided by Kellerman himself was that Kellerman

1  gardened and was moody.  A.T. 186-197.  Tarlecki's statement that Kellerman was moody

2  was implicitly reported by Kellerman himself as he reported that sometimes he would get

3  anxious, upset, angry, frustrated, depressed, and mad.  A.T.175-181.  Tarlecki's testimony

4  thus mirrored Kellerman's own testimony.

5      The ALJ gave valid reasons for rejecting Kellerman's testimony that are equally

6  relevant to Tarlecki's testimony.  For example, the ALJ found that Kellerman's testimony

7  was not credible because Kellerman's activities did not appear severely limiting, and

8  therefore were inconsistent with his symptom statements.  Since Tarlecki reported the

9  same activities (with the addition of gardening), the ALJ's reasoning is equally applicable to

10 Tarlecki's testimony.   Moreover, Kellerman's additional activity of gardening does not

11 support any further limitations; rather, it supports the ALJ's finding that Kellerman's

12 activities were inconsistent with allegations about the severity of his impairments.

13     Any limitations presented by Tarlecki were either validly rejected by the ALJ in

14 discussing Kellerman's testimony, or included in the ALJ's RFC.  Accordingly, absent the

15 error the ALJ's ultimate nondisability determination would remain the same.  See Molina,

16 674 F.3d at 1122.  Therefore, the court concludes that the ALJ's failure to give explicit

17 reasons for rejecting Tarlecki's testimony constituted harmless error.  For these reasons,

18 the court affirms the ALJ on this issue.

19 **3.    Dr. Wilson's Opinion**

20     Kellerman also argues that the ALJ erred in affording little weight to the mental RFC

21 assessment from treating physician, Dr. Jennifer Wilson, of Clinic Ole.

22     Dr. Wilson's RFC assessment consisted of a three-page, standardized, check-the-

23 box form in which Dr. Wilson did not provide any reasoning or clinical findings to support

24 her opinion that Kellerman was moderately limited in thirteen out of twenty categories of

25 work functioning.

26     The ALJ did not entirely reject Dr. Wilson's RFC assessment report; rather, the ALJ

27 gave the opinion limited weight.  He noted that Dr. Wilson did not provide any rationale for

28 her opinion; that treatment notes contradicted the limitations she opined; and that the

**United States District Court**
For the Northern District of California

1   record showed Kellerman's depression was stable on medication.

2   In conjunction with this issue, Kellerman first argues that the simple fact that Dr.

3   Wilson's assessment of Kellerman's RFC was not accompanied by any rationale was not a

4   valid reason for rejecting Dr. Wilson's opinion.  Kellerman contends that if the ALJ believed

5   Dr. Wilson's opinion required a rationale in order to be given greater weight, the ALJ had a

6   duty to request that Dr. Wilson provide such support.  Second, Kellerman disputes the

7   ALJ's finding that Dr. Wilson's RFC assessment was inconsistent with clinic notes which

8   suggested Kellerman's depression was mild and controlled under his medication regime.

9   Typically, the opinion of a treating physician is afforded more weight than a non-

10  treating physician's opinion.  See 20 C.F.R. § 404.1527(c)(2).  If a treating physician's

11  opinion is not well-supported by the record or is inconsistent with other substantial evidence

12  in the record, the ALJ may reject the treating physician's opinion only if he provides

13  "'specific and legitimate reasons' supported by substantial evidence in the record."  See

14  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995) (citing Murray v. Heckler, 722 F.2d 499,

15  502 (9th Cir. 1983)).  The Ninth Circuit has held that an "ALJ may 'permissibly reject[] . . .

16  check-off reports that [do] not contain any explanation of the bases of their conclusions.'"

17  Molina, 674 F.3d at 1111-12 (citing Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996);

18  Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001) ("[T]he regulations give more

19  weight to opinions that are explained than to those that are not")).

20  Generally, an ALJ has "'a special duty to fully and fairly develop the record and to

21  assure that the claimant's interests are considered.'"  Wildmark v. Barnhart, 454 F.3d 1063,

22  1068 (9th Cir. 2006) (quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)).

23  However, an "'ALJ's duty to develop the record further is triggered only when there is

24  ambiguous evidence or when the record is inadequate to allow for proper evaluation of the

25  evidence.'"  McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2010) (quoting Mayes v.

26  Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001); citing Bayliss v. Barnhart, 427 F.3d 1211,

27  1217 (9th Cir. 2005) ("the ALJ did not have a duty to recontact doctors before rejecting

28  parts of their opinions.")).

**United States District Court**
For the Northern District of California

1    Here, the ALJ did not error by limiting the weight he afforded to Dr. Wilson's report.

2    Dr. Wilson's RFC assessment consisted of a standardized form with several checked

3    boxes.  The report contained conclusory statements that were not supported by any

4    explanation or rationale.

5    Moreover, the ALJ did not have a duty to contact Dr. Wilson to request that she

6    provide supporting rationale for her RFC assessment.  Dr. Wilson's report was not

7    ambiguous as it was clearly a medical source statement concerning the nature and severity

8    of Kellerman's mental impairment.  Furthermore, Dr. Wilson's RFC report adequately

9    allowed for proper evaluation of the evidence because it was clear and concise.  Dr.

10   Wilson's report was neither ambiguous nor inadequate.  Rather, any shortfall lays in the

11   fact that the report was conclusory, void of any rationale, and contradicted by both clinic

12   notes and Kellerman's treatment.

13   Furthermore, there is substantial evidence in the record to support the ALJ's specific

14   and legitimate reasons for limiting the weight given to Dr. Wilson's report.  Looking to the

15   clinic notes, on December 15, 2009, Dr. Wilson noted that Kellerman's symptoms reflected

16   only mild depression.  In 2010, medical reports from Ole Clinic showed Kellerman's

17   depression was controlled and improving, as his mental status was typically normal, with

18   normal and pleasant mood, good judgment, and no suicidal ideation.  A.T. 426, 428, 432,

19   434.  Treating notes from other clinics also suggest that Kellerman suffered only mild

20   depression symptoms.  Dr. Renfro reported Kellerman's mood was mildly depressed.  A.T.

21   353.  Clinic notes from Solano County Health and Social Services reported Kellerman's

22   depression was "controlled," and also revealed that Kellerman "got a new job opportunity . .

23   . [and] th[at] was improving his mood."  A.T. 418.  Therefore, substantial evidence exists to

24   support the ALJ's decision to afford Dr. Wilson's RFC assessment little weight because it

25   was inconsistent with treating notes that showed Kellerman suffered from mild depression

26   that was controlled with medications.

27   Because the ALJ provided specific and legitimate reasons for discounting Dr.

28   Wilson's opinion, the court affirms the ALJ's decision to afford limited weight to Dr. Wilson's

RFC assessment.

**4.     Dr. Renfro's Opinion**

Kellerman contends that the ALJ erred in rejecting portions of Dr. Renfro's opinion because the ALJ did not provide specific or legitimate reasons to support his decision to discount the opinion.

After Kellerman applied for disability benefits he visited Dr. Renfro, an examining physician. Dr. Renfro performed a psychiatric evaluation of Kellerman. Dr. Renfro opined that Kellerman would be able to understand, remember, and carry out simple one-to-two step job instructions; would be unable to handle detailed or complex instructions; would be impaired in his abilities to relate and interact with others; would be impaired in persistence and pace; would be impaired in accepting instructions from supervisors; and would be impaired in working on a consistent basis. However, in his report, Dr. Renfro also noted that "[a] medical examination is recommended to assess limitations as they may relate to [Kellerman's] reported medical history and current ability to work." A.T. 354. Dr. Renfro further commented that his "evaluation is not to be and must not be construed to be a complete psychological evaluation for mental health purposes." A.T. 350.

The ALJ considered Dr. Renfro's report when determining Kellerman's RFC. The ALJ's RFC finding cited exhibits 11F and 8F, which respectively represent Dr. Klein's report and Dr. Renfro's report. The ALJ included a large portion of Dr. Renfro's findings in his RFC determination; however, the ALJ did not include Dr. Renfro's entire report. Specifically, the ALJ's RFC finding did not include Dr. Renfro's findings that Kellerman was impaired in his ability to (1) maintain persistence and pace, (2) perform work activities on a consistent basis, and (3) accept instructions from supervisors.

Kellerman argues that the ALJ erred because he did not provide specific and legitimate reasons for rejecting the three above-mentioned limitations.

The Commissioner notes that the ALJ cited both Dr. Renfro's report and Dr. Klein's report in support of his RFC finding. The Commissioner argues that the ALJ, in relying on Dr. Klein's opinion, effectively incorporated Dr. Klein's concerns about some of the

**United States District Court**
For the Northern District of California

1   limitations Dr. Renfro reported for Kellerman.  Specifically, Dr. Klein opined that "Dr. Renfro

2   relied too heavily on subjective statements from [Kellerman]."  A.T. 371.  The

3   Commissioner contends that the ALJ's reasons for rejecting parts of Dr. Renfro's opinion

4   were discussed by Dr. Klein, and therefore, by referencing Dr. Klein's opinion, the ALJ

5   provided good reasons for rejecting Dr. Renfro's opinion in part.

6        Generally, the opinion of an examining physician is given more weight than a non-

7   examining physician (i.e. a state agency reviewing physician).  See Lester, 81 F.3d at 830.

8   If an examining opinion is contradicted by a non-examining physician's opinion, an ALJ may

9   reject the opinion of the examining physician only if the ALJ provides "specific and

10  legitimate reasons" supported by substantial evidence in the record.  Id. at 830-31 (citing

11  Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995)).  A non-examining physician's

12  opinion, on its own, cannot constitute substantial evidence that justifies rejecting an

13  examining physician's opinion.  Id. at 831 (citing Pitzer v. Sullivan, 908 F.2d 502, 506 n. 4

14  (9th Cir. 1990); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984)).  However, a non-

15  examining opinion, when combined with something more, such as independent clinical

16  findings or claimant testimony, can constitute proper grounds for rejecting the opinion of an

17  examining physician.  Id. (citing Magallenes v. Bowen, 881 F.2d 747, 751-55 (9th Cir.

18  1989); Andrews, 53 F.3d at 1043; Roberts v. Shalala, 66 F.3d 179 (9th Cir. 1995)).  Where

19  there is conflicting clinical evidence, an ALJ must resolve such conflicts.  Magallenes, 881

20  F.2d at 750.

21       Here, contrary to Kellerman's suggestion, the ALJ did not reject Dr. Renfro's opinion.

22  Rather, the ALJ incorporated a substantial portion of Dr. Renfro's opinion and excluded

23  only three of Dr. Renfro's findings from his RFC determination.

24       This decision to exclude the three limitations was supported by substantial evidence.

25  Dr. Renfro suggested Kellerman was impaired in his ability to maintain persistence and

26  pace.  However, Dr. Renfro stated that he based this finding on Kellerman's self-reported

27  history of mood fluctuations and substance abuse.  As previously discussed, Kellerman

28  was found to lack credibility, thus his self-reported history was unreliable.  Dr. Klein, in his

1 | report, explained Kellerman could adequately sustain concentration, persistence and pace.

2 | In support of this finding, Dr. Klein noted Kellerman's testimony that he rode his bicycle,

3 | navigated to and from precise destinations, managed his own finances and was able to

4 | drive a car in traffic.  Both Dr. Klein's findings and Kellerman's own testimony show

5 | Kellerman was able to adequately sustain concentration, persistence and pace.

6 | Dr. Renfro also noted that Kellerman was impaired in his ability to perform work on a

7 | consistent basis; yet again, Dr. Renfro based this finding on Kellerman's unreliable

8 | statements regarding his own personal history.  Dr. Klein opined that while Kellerman was

9 | impaired in his ability to perform work consistently, he was not "markedly" limited.

10 | Moreover, although Kellerman reported his conditions prevented him from sustaining work

11 | on a consistent basis, the ALJ found this allegation was not credible considering Kellerman

12 | had suffered from depression for years, yet was able to maintain several long-term jobs in

13 | the past.

14 | Dr. Renfro further noted that Kellerman was impaired in his ability to accept

15 | instructions from supervisors.  This finding was based on Kellerman's self-reported history

16 | of anger, agitation and yelling on the job.  This self-reported history is contradictory to

17 | Kellerman's testimony that he can follow written instructions "pretty good," follow spoken

18 | instructions so long as he can "create a mental picture in his head of what's to be done,"

19 | and can "usually 'get along' with authority figures."  A.T. 179-80.  Kellerman's friend,

20 | Tarlecki, also testified that Kellerman was able to get along "okay" with authority figures

21 | (i.e. police, bosses, landlords).  Dr. Klein, in his report, noted that Kellerman's adequate

22 | work history suggested Kellerman had the capacity to interact with supervisors and others

23 | in a work situation.

24 | Dr. Klein had the advantage of reviewing the whole record, whereas Dr. Renfro

25 | reviewed limited materials and admittedly relied on Kellerman's self-reported history.  As

26 | previously discussed, Kellerman statements lacked veracity and were unreliable.

27 | The ALJ did not reject Dr. Renfro's opinion in its entirety; rather, the ALJ excluded

28 | three of Dr. Renfro's findings that were contradicted by other doctor reports and

1    Kellerman's own testimony.  The ALJ appropriately resolved the conflicts between Dr. Klein

2    and Dr. Renfro's reports.  See Magallanes, 881 F.2d at 750.  While the ALJ did not

3    expressly provide specific and legitimate reasons for excluding some of Dr. Renfro's stated

4    limitations, any resulting error was harmless because the ALJ's decision to exclude the

5    three limitations was supported by substantial evidence in the record.  Absent any error, the

6    overall nondisability determination would have remained the same.  Accordingly, the court

7    affirms the ALJ on this issue.

8    **5.    Dr. Klein's Opinion**

9        Kellerman also contends that the ALJ erred by failing to explain the weight given to

10   Dr. Klein's opinion, a state agency non-examining physician.

11       On May 22, 2009, after reviewing the entire record, Dr. Klein completed an RFC

12   assessment of Kellerman.  Dr. Klein noted Kellerman was moderately limited in six out of

13   twenty mental functions, but did not find Kellerman to be "markedly" limited in any category

14   of mental functional capacity.

15       As discussed previously, the ALJ cited to Dr. Klein's opinion in his RFC finding.  The

16   ALJ included Dr. Klein's opinion, with one clear exception: Dr. Klein opined Kellerman could

17   complete "detailed tasks," yet the ALJ found Kellerman could only complete "one-to-two

18   step tasks."

19       Kellerman argues the ALJ's RFC finding failed to include nonexertional limitations

20   assessed by Dr. Klein.  Kellerman further argues that the ALJ erred because he failed to

21   explain the weight afforded to Dr. Klein's opinion.

22       The Commissioner contends that the ALJ properly relied on Dr. Klein's report.

23   Additionally, the Commissioner notes that where the ALJ deviated from Dr. Klein's report,

24   he did so in Kellerman's favor.  For example, Dr. Klein opined that Kellerman was able to

25   perform simple or detailed tasks.  Yet, the ALJ, after harmonizing the clinical evidence,

26   found that Kellerman's ability was limited to simple, one-to-two step tasks.  The

27   Commissioner contends that the ALJ appropriately resolved conflicts and ambiguities in the

28   medical evidence and committed no error in his treatment of Dr. Klein's report.

United States District Court

For the Northern District of California

1  According to the Social Security Administration's regulations, an ALJ must consider

2  and evaluate state agency opinion evidence, and, if a treating physician is not given

3  controlling weight, the ALJ must "explain in the decision the weight given to the opinion of a

4  State agency medical or physiological consultant . . . ."  20 C.F.R. § 404.1527(e)(2)(ii).[3]

5  Here, the ALJ considered and evaluated Dr. Klein's report.  The ALJ relied on Dr.

6  Klein's opinion where it was consistent with the record.  Moreover, the ALJ resolved

7  inconsistencies between it and other medical reports.  Although Kellerman claims the ALJ

8  did not include nonexertional limitations assessed by Dr. Klein, he fails to identify specific

9  nonexertional limitations that should have been included.

10  The ALJ incorporated Dr. Klein's opinion, and where the ALJ gave Dr. Klein's

11  opinion less weight, he did so in Kellerman's favor.  Accordingly, any error by the ALJ in

12  failing to explain the weight he gave to Dr. Klein's opinion, was harmless.  See Burch v.

13  Barnhart, 400 F.3d 676, 682 (9th Cir. 2005) (concluding that any error by the ALJ at step

14  two was harmless because the step was resolved in claimant's favor).  Moreover, even if

15  the ALJ had discussed the weight afforded to Dr. Klein's report, the ALJ's decision would

16  have remained the same.  See Molina, 674 F.3d at 1122. (concluding the ALJ's error did

17  not alter the ultimate nondisability determination and was therefore harmless)

18  In sum, the ALJ properly considered and evaluated Dr. Klein's report.  Although the

19  ALJ erred by not explaining the weight afforded to Dr. Klein's opinion, this error was

20  harmless and had no effect on the ALJ's nondisability determination.  For these reasons,

21  the court affirms the ALJ on this issue.

22  **6.  The VE's testimony**

23  Kellerman argues the ALJ erred at step five because the VE's testimony was flawed

24  since it was not based on the proper framework, it was inconsistent with the Dictionary of

25  Occupational Titles ("DOT"), and it did not include all of Kellerman's impairments.

26  ////

27  _____

28  [3] Dr. Wilson was Kellerman's treating physician.  Since her opinion was not given controlling weight, 20 C.F.R. § 404.1527(e)(2)(ii) requires the ALJ to "explain . . . the weight given to [Dr. Klein]," a state agency medical consultant.

**A.   Improper Framework**

The ALJ found that Kellerman could perform "light work," yet noted several exceptions that limited Kellerman from being able to perform the full range of light work. Accordingly, the ALJ's RFC determination in effect rested somewhere between the "light work" category and the "sedentary work" category used by the Social Security Administration ("SSA").

As noted, at the hearing, the VE testified that Kellerman could perform light, unskilled jobs as a table worker and electronic goods assembler, which respectively represented 549,000 and 300,000 jobs in the national economy and 33,000 and 35,000 jobs in the San Francisco Bay area.  The VE further testified that the number of jobs existing both nationally and locally in these two occupations would erode by twenty-five percent given Kellerman's need for a sit/stand option.  Based on the VE's testimony regarding Kellerman's unique occupational base, the ALJ found that Kellerman was capable of performing work that existed in significant numbers in the national economy.

Kellerman contends the VE failed to use the medical vocational guidelines ("Grids") as a framework for his testimony.  In conjunction with this failure, Kellerman argues both that the VE failed to assess the extent to which his additional limitations eroded the "light work" occupational base, and the VE's failure to address whether the table worker and assembler jobs, after accounting for Kellerman's additional limitations, maintained their "light work" classification, or instead became more accurately classified as "sedentary work."

At times, an ALJ may rely on the Grids to determine whether substantial gainful work exists for a claimant who has substantially uniform levels of impairment (i.e., can perform full range "light work").  See  Thomas, 278 F.3d at 960 (citing Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000)). However, "[w]hen the Grids do not adequately take into account claimant's [specific] abilities and limitations, they are to be used only as a framework, and a vocational expert must be consulted." Id. (citing Moore, 216 at 869–70).  An "ALJ fulfills his obligation to determine the claimant's occupational base by consulting a vocational expert

**United States District Court**
For the Northern District of California

1   regarding whether a person with claimant's profile could perform substantial gainful work in

2   the economy." Id. (citing Moore, 216 F.3d at 870-71 (citing SSR 83-12)).

3       Here, since the Grids did not adequately take into account all of Kellerman's

4   limitations, the ALJ properly consulted a VE.  The VE, using the Grids as a framework,

5   determined the number of "light work" occupations Kellerman could perform.  The VE

6   testified that Kellerman could perform two "light, unskilled" occupations: table worker and

7   electronic goods assembler.

8       After testifying to the number of jobs that existed in each of the two occupations, the

9   VE adjusted the statistics to accommodate Kellerman's additional limitations.  The VE

10  testified to a "25 percent *erosion*" to account for Kellerman's need for a sit/stand option.

11  A.T. 90-91.  Accordingly, Kellerman's assertion that the VE failed to assess the extent to

12  which Kellerman's additional limitations eroded the "light work" occupational base is

13  inaccurate.

14      Moreover, the ALJ consulted a VE because Kellerman did not satisfy the uniform

15  "light work"  or "sedentary work" categories.  Accordingly, Kellerman is mistaken that the

16  VE was subsequently required to classify the table worker and assembler jobs as either

17  primarily "light" or "sedentary" after applying Kellerman's additional limitations.

18      Kellerman's arguments on this issue lack merit.  The VE used the Grids as a

19  framework to determine Kellerman's unique occupational base, and testified that the

20  number of jobs existing in the economy would be partially eroded because of Kellerman's

21  additional limitations.  For these reasons, the court affirms the ALJ on this issue.

22          **B.   Inconsistencies Between the VE's Testimony and the DOT**

23      Next, Kellerman argues that the table worker and assembler jobs identified by the

24  VE require a level of mental reasoning beyond his ability.

25      When an ALJ determines that a claimant may perform certain jobs that exist in the

26  national economy, the ALJ takes administrative notice of reliable job information provided in

27  the Dictionary of Occupational Titles ("DOT"), which is published by the Department of

28  Labor.  See 20 C.F.R. § 416.966(d)(1).  The DOT lists requirements of various occupations,

25

United States District Court
For the Northern District of California

1  including the level of mental reasoning required for each occupation.  See Meissl v.

2  Barnhart, 403 F. Supp. 2d 981, 982 (C.D. Cal. 2005).  The DOT uses a six-point scale to

3  classify reasoning levels required for specific jobs.  Id.

4         According to the DOT, the table worker and assembler jobs identified by the VE

5  require a level two reasoning ability.  A level two reasoning ability requires an individual to

6  be able to "'[a]pply commonsense understanding to carry out detailed but uninvolved

7  written or oral instructions', and '[d]eal with problems involving a few concrete variables in

8  or from standardized situations.'"  Meissl, 403 F. Supp. 2d at 982.

9         Here, the ALJ found that Kellerman was limited to remembering and carrying out

10  one or two step tasks.

11        Kellerman first argues that the ALJ's RFC finding and the VE's testimony are

12  inconsistent.  Kellerman contends that the jobs the VE testified that Kellerman could

13  perform require a level of mental reasoning beyond his ability and RFC.  Second,

14  Kellerman argues that the ALJ erred because he failed to require the VE to explain why his

15  testimony deviated from the DOT.

16        In opposition, the Commissioner contends Kellerman wrongly conflates the DOT's

17  reasoning levels and the ALJ's RFC finding.  The Commissioner argues that these are two

18  separate issues.

19        District courts in the Ninth Circuit have recognized a distinction between the DOT's

20  reasoning levels and the SSA's categories of mental ability.  As previously mentioned, the

21  DOT uses a six-point scale to classify reasoning levels required for specific jobs.  See

22  Meissl, 403 F. Supp. 2d at 982.  Unlike the "graduated, measured and finely tuned scale"

23  used by the DOT, the SSA "separates a claimant's ability to understand and remember into

24  just two categories: 'short and simple instructions' and 'detailed' or 'complex.'"  Whitaker v.

25  Astrue, 2010 WL 1444659, at *5 (E.D. Cal. April 12, 2010) (quoting Meissl, 403 F. Supp. 2d

26  at 984).  Accordingly, "a neat, one-to-one parallel'" does not exist between the DOT's

27  reasoning levels and the SSA's categories of mental ability.  Id. (citing Meissl, 403 F. Supp.

28  2d at 983-84).

**United States District Court**
For the Northern District of California

1    Despite the fact that a "one-to-one parallel" does not exist, the general rule is that a

2    VE's testimony should be consistent with the DOT.  See Massachi v. Astrue, 486 F.3d

3    1149, 1153 (9th Cir. 2007) (citing SSR 00-4p at *2).  When conflict arises between the VE's

4    testimony and the DOT, "[n]either the [DOT] nor the [VE]. . . evidence automatically

5    'trumps.'"  Id. (quoting SSR 00-4p at *2).  Rather, if conflict arises, the ALJ must ask the VE

6    to give a reasonable explanation for the conflict.  Id. (citing SSR 00-4p at *4).  If an ALJ

7    does not request or evaluate the VE's explanation, a court cannot determine whether

8    substantial evidence supports the ALJ's step-five finding.  See id. at 1153-54.  "However,

9    the failure to ask about a conflict is harmless where *there is no conflict*, or where 'the

10   vocational expert . . . provided sufficient support for her conclusion so as to justify any

11   potential conflicts.'"  Eckard v. Astrue, 2012 WL 669895, at *7 (E.D. Cal. Feb. 29, 2012)

12   (quoting Massachi, 486 F.3d at 1154 n. 19) (emphasis added)).

13   In Meissl v. Barnhart, the claimant asserted that according to the ALJ's RFC finding,

14   her ability was limited to performing only simple, repetitive tasks.  403 F. Supp. 2d at 982.

15   The claimant argued that the ALJ's RFC finding and the VE's testimony were in conflict

16   because the jobs the VE testified that she could perform were listed in the DOT as requiring

17   reasoning levels two and three, which the claimant asserted extended beyond her ability to

18   perform only simple, repetitive tasks.  Id.  In response, the court discussed the difference

19   between the DOT's six-point scale and the SSA's two category system.  Id. at 982-84.  The

20   court also examined the language used by the DOT.  Id. at 984.  According to the DOT, a

21   reasoning level of two requires the ability to "[a]pply commonsense understanding to carry

22   out detailed but uninvolved written or oral instructions."  Id.  The word "detailed" is

23   immediately qualified by the word "uninvolved."  Id.  Therefore, the court stated that the

24   rigorousness of the word "detailed" is "downplayed . . . by labeling [the instructions] as

25   being 'uninvolved.'"  Id.  The court held that "[a] reasoning level of two, then, *does not*

26   *conflict* with a limitation to simple repetitive tasks."  Id. at 984-85 (emphasis added).

27   In Eckard v. Astrue, the court, relying heavily on Meissl, held that there was *no*

28   *conflict* between the DOT's level two reasoning and an RFC limitation to "simple one or two

**United States District Court**
For the Northern District of California

1  step instructions."  2012 WL 669895, at *7-8 (E.D. Cal. Feb. 29, 2012) (emphasis added).

2  Any attempt to distinguish the two was held to be "without merit."  Id. at *8.

3      Here, the ALJ's RFC finding stated that Kellerman could "remember and carry out

4  one to two step tasks."  The VE testified that Kellerman could perform two jobs: table

5  worker and electronic goods assembler.  The table worker and assembler jobs identified by

6  the VE are listed in the DOT as requiring level two reasoning.  Applying the logic from

7  Meissl and Eckard, the court finds that Kellerman's attempt to distinguish the DOT's

8  reasoning level two classification from his RFC limitation to "simple one or two step

9  instructions" is meritless.  See Eckard, 2012 WL 669895, at *8; see also Meissl, 403 F.

10  Supp. 2d at 984-84.  Therefore, there is no conflict between the VE's testimony and the

11  DOT evidence.  Absent any conflict, the ALJ's failure to obtain the VE's explanation for his

12  deviation from the DOT is harmless.  See Eckard, 2012 WL 669895, at *7 (citing Massachi,

13  486 F.3d at 1154 n. 19).   For these reasons, the court affirms the ALJ on this issue.

14        **C.   VE's Failure to Include All of Kellerman's Limitations**

15      Finally, Kellerman argues the VE's testimony was flawed because it did not

16  incorporate all of his limitations.

17      At step five, the ALJ properly consulted the VE to determine Kellerman's

18  occupational base.  In eliciting the VE's testimony regarding Kellerman's ability to perform

19  other work, the ALJ posed a hypothetical to the VE.  The ALJ asked the VE whether a

20  person with Kellerman's age, education, work experience and RFC could perform work that

21  existed in significant numbers in the national economy.

22      However, Kellerman argues that something different occurred.  He contends that the

23  ALJ did not accurately present his RFC in the ALJ's hypothetical to the VE.   Kellerman's

24  argument is specifically based on the ALJ's use of the word "and" rather than "or."  More

25  specifically, Kellerman argues that the ALJ's hypothetical mischaracterized Kellerman's

26  RFC as including the ability to "stand and walk" for up to four hours in an eight hour

27  workday, when in reality the ALJ's RFC finding states that Kellerman has the ability to

28  "stand or walk" for up to four hours in a eight hour workday.  Kellerman argues that the

1   ALJ's use of the word "and" was not supported by the record, and that as a result the VE's

2   testimony has no evidentiary value.

3          The Commissioner responds that Kellerman has failed to meet his burden of

4   showing how the alleged error was harmful.  Moreover, the Commissioner notes that the

5   ALJ's use of the word "and" was supported by the record.

6          At a hearing, if an ALJ calls upon a VE to testify, the ALJ "poses hypothetical

7   questions to the [VE] that 'set out all of the claimant's impairments' for the [VE's]

8   consideration." Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999) (citing Gamer v.

9   Sec'y of Health and Human Servs., 815 F.2d 1275, 1279 (9th Cir. 1987)).  The ALJ's

10  hypothetical questions must depict the claimant's impairments and limitations, and must be

11  supported by the record.  Id.  (citing Gamer, 815 F.2d at 1279-80).

12         Kellerman's argument is seemingly frivolous.  First, the Commissioner correctly

13  notes that the burden is on the party attacking the SSA's determination to show that the

14  error was harmful.  See Shinseki v. Sanders, 556 U.S. 396, 409 (2009) ("the burden of

15  showing that an error is harmful normally falls upon the party attacking the agency's

16  determination"); McLeod v. Astrue, 640 F.3d 881, 887 (9th Cir. 2011) ("the burden is on the

17  party attacking the agency's determination to show that prejudice resulted from the error").

18  Here, Kellerman has failed to pinpoint the specific harm that resulted from the ALJ's use of

19  the word "and" rather than "or."  Kellerman makes the broad argument that because of the

20  mistake the VE's testimony was not supported by the record and was void of any

21  evidentiary value.  Kellerman's argument is conclusory and insufficient.  Regardless, even if

22  the court were to assume Kellerman has shown that harm resulted, his argument fails on

23  the merits.  As the Commissioner noted, the ALJ's use of the word "and" is supported by

24  the record.

25         When determining Kellerman's RFC, the ALJ relied on Dr. Boparai's opinion.  Dr.

26  Boparai opined that Kellerman could "stand and/or walk" for up to four hours in an eight

27  hour  workday.  A.T. 359.  This phrasing reflects the common practice of using the words

28  "and" and "or" flexibly and interchangeably when a backslash is used ("/").  This phrasing

29

**United States District Court**
For the Northern District of California

also shows that the ALJ's use of the word "and" was supported by evidence in the record and thus did not constitute legal error.

Even assuming the ALJ's use of the word "and" rather than "or" constituted error, it would certainly have been harmless.  In addition to Kellerman's limited ability to sit or stand no more than four hours in an eight hour workday, Kellerman also required "an option to sit/stand at 30 minute intervals."  The VE's testimony accounted for Kellerman's need for the sit/stand option.  Therefore, since the VE's testimony pertained to jobs that permitted Kellerman to alternate between sitting and standing every thirty minutes, surely those jobs would have also accommodated Kellerman's need to stand or walk for no more than four hours in an eight hour workday.[4]  If Kellerman chose to alternate from sitting and standing every half hour during an eight hour workday (as the option permits him to do), he would spend a total of four hours sitting and a total of four hours standing.  The VE's testimony encompassed Kellerman's RFC to "stand or walk" for no more than four hours.  Therefore, any alleged error by the ALJ when reciting Kellerman's limitations to the VE would have been harmless.

Kellerman has failed to satisfy his burden of showing that the ALJ committed a harmful error.  The ALJ's use of the "and" was supported by the record.  Moreover, even if the ALJ erred, it had no effect on the ALJ's nondisability determination.  Therefore, the court affirms the ALJ on this issue.

### CONCLUSION

For the foregoing reasons, the court DENIES Kellerman's motion for summary judgment, GRANTS the Commissioner's cross-motion for summary judgment, and AFFIRMS the ALJ's decision.

////

////

---

[4]In fact, the ALJ asked the VE: "Would your testimony regarding these jobs and their incidence in the economy change if I asked you to further assume that such an individual could sit for four hours maximum and stand and walk for four hours maximum in the eight hour work day?"  A.T. 91.  The VE responded: "Not really.  I took that into consideration with the sit/stand option.  That's basically what sit/stand option is."  Id.

**United States District Court**
For the Northern District of California

This order fully adjudicates the motions listed at numbers twenty-one and twenty-four of the clerk's docket for this case.  The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: July 27, 2012

_____
PHYLLIS J. HAMILTON
United States District Judge

31